

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-13-00115-CR

Charles Matthew **SAENZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2011CR3288A
Honorable Mary D. Roman, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:       Sandee Bryan Marion, Justice
               Rebeca C. Martinez, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed:  March 19, 2014

AFFIRMED AS REFORMED

A jury found Charles Matthew Saenz guilty of aggravated robbery with a deadly weapon. Saenz was fined $10,000 and sentenced to confinement for life in the Texas Department of Criminal Justice – Institutional Division.  Saenz appeals the judgment, arguing the trial court erred in its evidentiary rulings and in assessing court-appointed attorney's fees as costs.  We reform the judgment to delete the assessment of attorney's fees and affirm the judgment as reformed.

**BACKGROUND**

In December 2010, two men walked into the Radio Shack store at which Antonio Alonzo was working as the manager. Alonzo testified that one of the men, who he identified in court as Charles Saenz, approached Alonzo and asked him about an MP3 player. Alonzo got the player out of a locked case and walked to the register. After Alonzo rang up the sale and opened the register, Saenz took a small chrome revolver out of his sweatshirt and held the gun down on the counter, pointing it toward Alonzo. Saenz ordered Alonzo to give him the money in the register. Alonzo testified that although he was afraid, he did not give Saenz the money and he told Saenz he would be caught. Alonzo testified he looked at Saenz's face during the entire episode, so he would remember its features later. Saenz then reached over the counter and took about $700 out of the register.

After Saenz and his companion left the store, Alonzo immediately contacted the police. He reported that the man with the gun was the taller of the two robbers and he wore a tan baseball cap, a gray hooded sweatshirt with an insignia on it, and blue jeans. He described the weapon as a chrome colored revolver, possibly a .38. He told police the other man wore a black cap, a dark gray long sleeve sweatshirt, and jeans. Alonzo gave the police a copy of the store security video showing the robbery. The video was admitted into evidence and published to the jury. About a month after the robbery, Alonzo identified Saenz in a photographic lineup as the robber with the gun. Alonzo identified Juan Silva as the robber who came into the store with Saenz.

Several weeks after the robbery, the San Antonio police received a Crime Stoppers tip that Saenz had been involved in the robbery. Police obtained search warrants for Saenz's house and vehicle. They recovered a tan cap with a BMW logo on the gear shift in Saenz's truck and a loaded silver Smith and Wesson .38 Special Plus P revolver in the center console of the truck. In the

house, the police found a light gray hooded sweatshirt with a Notre Dame Fighting Irish logo on it and another tan BMW cap.

Saenz's wife at the time of the robbery testified under subpoena. She identified Saenz in the store surveillance video and identified the clothes he was wearing in the video as those taken from her home during execution of the search warrant.

Police arrested Saenz, Juan Jesus Silva, and Scott Craig. Silva entered into a plea bargain and agreed to testify for the State in exchange for an agreed sentence cap of twenty-five years. Silva testified he was with Saenz and Craig the night of the robbery. They initially went to Radio Shack so Silva could buy his wife an MP3 player for Christmas. When they got to the parking lot, Saenz decided to rob the store. Silva testified that Craig stayed in Saenz's truck. Silva testified he and Saenz were both wearing sweatshirts belonging to Saenz. Saenz's shirt had a Notre Dame logo on it, and he wore a cap with a BMW logo. Saenz took a silver .38 Special with him into the store. The plan was to pretend to buy something so the clerk would open the cash register.

Silva identified himself and Saenz on the store surveillance video. He testified that when the manager opened the cash register, Saenz pulled out his gun, pointed it at the manager, and told him to give him the money. Silva testified the man started arguing with Saenz, telling him they would be caught. Silva testified that while Saenz and the manager were arguing, Silva heard the hammer pull back on the revolver. At that point, Silva told Alonzo to just give Saenz the money, and Silva walked away because he thought Saenz was going to shoot the manager. Silva testified Saenz then reached over and took the money out of the register.

After the jury found Saenz guilty of aggravated robbery of the Radio Shack, the State presented evidence that Saenz had been involved in at least six other armed robberies during December 2010 and January 2011. The jury sentenced Saenz to life in prison. Saenz timely appealed.

**DEMONSTRATIVE EVIDENCE**

In his first point of error, Saenz argues the trial court erred when it refused to allow him to conduct an in-court demonstration for the jury during the guilt/innocence phase of the trial. State's witness Crime Scene Investigator Melissa Hurst testified about the revolver recovered during the execution of the search warrants. During cross examination, defense counsel asked Officer Hurst to "hold the .38 caliber revolver up to the microphone and cock it." The officer was unable to pull back the hammer because of a safety mechanism that had been placed on the revolver by court security personnel. Defense counsel told the court he "would like to let the jury hear what the sound of a cocked pistol is. It is a unique noise and I believe it's going to be critical to my case." In a discussion outside the presence of the jury, defense counsel explained that the demonstration was meant to attack the credibility of Alonzo, the store manager. Counsel asserted that Alonzo had testified "very meticulously when he recalled the events of that day. The sound is unique and you don't forget it. It stands out like a sore thumb that he didn't mention it. It goes to his credibility."[1] Although the State did not object to the demonstration, the trial court ruled it would not allow the security device to be removed and therefore declined to allow the demonstration.

We review the trial court's ruling on the admissibility of evidence for abuse of discretion. *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). We must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Id.* For an otherwise relevant demonstration to be admissible, it must be conducted under conditions that are substantially similar to the event to be duplicated. *Cantu v. State*, 738 S.W.2d 249, 255 (Tex. Crim. App. 1987).

---

[1] We note that Alonzo was not asked during either direct or cross-examination whether he had heard the gun being cocked, whether he heard any unusual sound, or whether he had testified about every detail he remembered about the robbery.

Any relevance of the evidence for impeachment purposes was dependent on a showing that a person in Alonzo's situation could not have failed to both hear and to appreciate the sound being made. The record does not show Saenz made any effort to substantially duplicate the circumstances at the Radio Shack. Saenz did not present or offer to present any evidence about the presence or absence of background noise in the store at the time of the robbery. Although Silva had testified that Alonzo and Saenz were arguing when Silva heard the hammer pulled, Saenz asked the witness to cock the gun without attempting to replicate the noise of background argument. Perhaps most significant, Saenz asked the witness to cock the revolver as she held it next to the microphone. Saenz did not make any showing in the trial court and does not argue on appeal that the sound of the hammer being pulled back, made into a microphone in a reasonably quiet courtroom, would reasonably replicate the sound heard by Alonzo across the counter in the store during an argument in the midst of a robbery.

Saenz has not shown that the amplified sound he sought to demonstrate would have been relevant for any purpose. We conclude the trial court did not abuse its discretion in excluding the demonstrative evidence.

### PUNISHMENT PHASE TESTIMONY

In his second point of error, Saenz contends the trial court abused its discretion in admitting unfairly prejudicial testimony during the punishment phase of the trial, in violation of Texas Rule of Evidence 403.

During the punishment phase, the State called Silva to testify about the history of his relationship with Saenz and the series of robberies they had conducted together. Silva testified that he and Saenz had used drugs together and both had also sold drugs. Silva was in debt to Saenz for unpaid drug purchases. After Saenz got married, he needed more money and expected the people who owed him to pay. Silva did not have money to repay Saenz, and Saenz therefore

suggested he get the money by committing robberies. Saenz "taught" Silva how to commit the robberies – what to wear, where to park, and how to get the clerk to open the cash register – and provided a weapon. Silva testified about the details of five armed robberies, in addition to the Radio Shack robbery, committed during December 2010 and January 2011, in which both he and Saenz participated. Saenz told Silva before a January 18, 2011 robbery of a Game Stop that that was the last robbery in which Silva needed to participate and thereafter Silva's debt would be paid. The men were arrested shortly after that robbery.

Scott Craig testified he had been charged with two aggravated robberies, and he was testifying in exchange for a plea agreement that capped his punishment at 18 years in prison. Craig's relationship with Saenz began years earlier when he started buying cocaine from Saenz. Craig eventually began buying the cocaine on credit and became indebted to Saenz for about $5,000. Craig testified that Saenz had once suggested he could settle his debt by killing Saenz's ex-wife, Maria. Craig testified he did not agree to do so and he remained in Saenz's debt. Craig also testified Saenz found him in 2010 and began pressuring him to help commit some robberies as a means of paying off his debt. Craig then testified about the details of three aggravated robberies he committed with Saenz in December 2010, including one that Silva had not mentioned.

During defense counsel's cross-examination of Silva, the following exchange occurred:

DEFENSE COUNSEL:   You said that you thought that you were under a threat to keep robbing, to keep robbing these places?

SILVA:   I didn't think, I kind of knew.

DEFENSE COUNSEL:   Did you have access to a telephone during this period of time?

SILVA:   Okay. You are talking about like a threat right then and there?

DEFENSE COUNSEL:   The whole time, the whole time that you were doing these robberies, you felt like you had to do it?

SILVA: Yeah.

DEFENSE COUNSEL: Did you have access to a telephone during that period of time?

SILVA: Yes.

DEFENSE COUNSEL: You didn't call the police during that period of time and say, "Oh, my goodness, my life is in danger. Please help me"?

SILVA: I didn't think of it that way, no. I just — I — the reason why I thought that I had to do it is what can happen later on.

DEFENSE COUNSEL: What could happen later on?

SILVA: Something could happen to my family.

DEFENSE COUNSEL: And you didn't think that was important enough to call the police?

SILVA: Well, I don't know how — like —

DEFENSE COUNSEL: Or you were being just so selfish with what you were doing that your family didn't really matter at that time?

SILVA: (No audible response)

DEFENSE COUNSEL: You felt your family was in danger. You said you felt your family was in danger. You didn't bother calling the police at that time?

SILVA: No. I didn't call the police, so I just — I did what he wanted me —

DEFENSE COUNSEL: You pretty much kept on doing what you had been doing?

SILVA: What he wanted me to.

When counsel passed the witness, the State approached the bench and asked permission to elicit evidence about an extraneous offense by asking Silva why he felt threatened by Saenz. Counsel argued the defense had "opened the door" to evidence about Silva's motive for doing what Saenz wanted and the basis for his fear of Saenz. Counsel told the court Silva would testify Saenz had told him "that he had killed his girlfriend, Vanessa, in Corpus Christi, and she was found dead on the beach. That is the reason he feels threatened." The trial court overruled Saenz's Rule 403

objection that the probative value of the testimony was substantially outweighed by the danger of unfair prejudice.

After the bench conference, Silva testified he felt his family might be in danger if he did not help Saenz with the robberies because Saenz had previously told him that he had gotten "rid of somebody that he needed to get rid of." Saenz had been talking about "Vanessa," who "turned up dead." Silva testified that he was "scared" not to do what Saenz wanted because he "g[o]t rid of somebody and g[o]t away with it."

We again review the trial court's decision regarding admissibility of evidence for abuse of discretion, and we must uphold the trial court's decision if it is within the zone of reasonable disagreement. *Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006). Evidence that is relevant may nevertheless be excluded under Rule 403 if its probative value is substantially outweighed by danger of unfair prejudice. *See id.* at 843; TEX. R. EVID. 403. Our review of the trial court's ruling on a Rule 403 objection may include consideration of the probative value of the evidence, the proponent's need for the evidence, time needed to develop the evidence, and the potential of the evidence to impress the jury in an irrational, but indelible way. *Rodriguez*, 203 S.W.3d at 843.

In the punishment phase of a criminal case, the probative value of the evidence is not a question of logical relevance, but one of policy. *Id.* at 842 (discussing *Miller-El v. State*, 782 S.W.2d 892, 894-95 (Tex. Crim. App. 1990)). Evidence is relevant to punishment if "it is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Id.* The State argues the probative value of the evidence is what it shows about how Saenz manipulates and intimidates others — that Saenz is the type of person who would say he had committed murder and had gotten away with it in order to intimidate others and induce them to do his will. We agree that evidence is probative of Saenz's character and moral culpability, and

something the jury could properly consider in sentencing. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2013); *Rodriguez*, 203 S.W.3d at 842. This factor weighs in favor of admitting the evidence.

The State proffered this evidence only after the defense challenged Silva's credibility, repeatedly casting doubt on his testimony about why he went along with Saenz instead of calling the police. Silva was one of the State's principal witnesses in the punishment phase. He put the Radio Shack robbery in context of the two-month crime spree Saenz orchestrated. Silva's characterization of Saenz as the director of the spree, the one who showed the others what to do and provided the weapons, was critical to the State's argument that Saenz deserved punishment more severe than the probation he was requesting. The defense's challenge to Silva's characterization of his and Saenz's respective roles cast doubt on the State's evidence about Saenz's character and moral culpability. Allowing Silva to explain *why* he did as Saenz asked instead of going to the police was crucial to Silva's credibility with the jury. The evidence was developed in a few simple questions and took a minimal amount of time. These factors also weigh in favor of the court's decision to admit the evidence.

Saenz contends that evidence of an uncharged, unindicted, and unsolved murder is extremely prejudicial. He argues that murder is an "order of magnitude" higher on "anyone's list of heinous crimes" and would necessarily leave an indelible impression on the jury. In light of the lack of evidence that Saenz committed the murder, he contends it would be an irrational impression. We agree with Saenz that this factor weighs in favor of excluding the evidence.

After weighing the considerations, we conclude the trial court's decision to admit the evidence was within the zone of reasonable disagreement. The evidence was highly probative of Saenz's character and the State needed the evidence to rehabilitate Silva's credibility with the jury. Any danger of unfair prejudice was mitigated somewhat by the fact that the evidence was elicited

only in the context of the effect Saenz's statement had on Silva. We hold the evidence was not unfairly prejudicial so as to require reversal and the trial court did not abuse its discretion by admitting it. We overrule Saenz's second point of error.

### APPOINTED ATTORNEY'S FEES ASSESSED AS COSTS

In his final point of error, Saenz argues the record does not support "the trial court's order assessing court costs and attorney's fees." However, the substance of the brief challenges only the assessment of attorney's fees against Saenz. The brief does not contain any argument that the assessment of general court costs was improper. In fact, appellant concedes that "general court costs must be assessed, regardless of whether there is a finding of indigence" and that "the $334 in court costs is supported by the bill of costs." We therefore address only the assessment of attorney's fees against appellant.

The judgment assesses "Court costs: $334.00 PLUS ATTY FEES." The certified bill of cost filed in a supplemental record includes $6,750.00 in court-appointed attorney's fees. *See* TEX. CODE CRIM. PROC. ANN. art. 103.006 (West 2006) (providing that if a criminal action is appealed, an officer of the court shall certify and sign a bill of costs stating the costs that have accrued and send the bill of costs to the appellate court).

Attorney Wayne Ted Wood was appointed to represent "indigent defendant" Charles Matthew Saenz on August 10, 2012.[2] After filing a motion for new trial and a notice of appeal, Wood filed a motion to withdraw as counsel and for appointment of appellate counsel. The trial court granted the motion and, "in accordance with Article 26.04(f) . . . Code of Criminal

---

[2] The clerk's record reflects Saenz was represented by retained counsel for a three-month period while the case was pending in the trial court. Retained counsel moved to withdraw six months before the case was tried, and attorney Wood was appointed.

Procedure," appointed counsel to represent Saenz on appeal. *See* TEX. CODE CRIM. PROC. ANN. art. 26.04 (West Supp. 2013) (stating procedures for appointing counsel for indigent defendants).

A "defendant who is determined by the court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." TEX. CODE CRIM. PROC. ANN. art. 26.04(p) (West Supp. 2013); *Cates v. State*, 402 S.W.3d 250, 251 (Tex. Crim. App. 2013). The record does not contain a finding by the trial court that Saenz's financial circumstances materially changed after trial counsel was appointed in August 2012. Nor does the record provide any factual basis for such a finding. *See Cates*, 402 S.W.3d at 252. We therefore modify the judgment of the trial court to delete the requirement that Saenz repay the costs of court-appointed counsel, assessed at $6,750.00, as reflected in the Bexar County District Clerk's Amended Bill of Cost.[3]

We affirm the judgment of the trial court as reformed.

Luz Elena D. Chapa, Justice

Do not publish

---

[3] The State asserted in a cross point that the trial court should not have appointed counsel to represent appellant. Assuming this issue may properly be raised by cross-point, *see Pfeiffer v. State*, 363 S.W.3d 594 (Tex. Crim. App. 2012), the State waived it by failing to object to the appointment of counsel in the trial court.